United States District Court
Southern District of Texas
**ENTERED**
December 03, 2024
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SUNRGY, LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:24-cv-3583 |
| | § | |
| MONICA ALFARO, *et al.*, | § | |
| | § | |
| *Defendants.* | § | |

**MEMORANDUM ORDER AND PRELIMINARY INJUNCTION**

Pending before the Court is Plaintiff Sunrgy, LLC's ("Plaintiff" or "Sunrgy") Motion for Preliminary Injunction (Doc. No. 17) against Defendants Monica Alfaro ("Alfaro"), Omar Flores ("Flores"), Jose Guevara ("Guevara") (collectively, the "Individual Defendants") and SolarTEK Distributors, LLC ("SolarTEK"). The four named defendants are, collectively, the "Defendants." Plaintiff filed a supplement to its Motion for Preliminary Injunction. (Doc. No. 43). Defendants responded in opposition (Doc. No. 48) and Plaintiff replied (Doc. No. 51). Having considered Plaintiff's Motion, the supporting declarations and exhibits, and other evidence and argument presented to the Court, the Court hereby **GRANTS as modified** Plaintiff's Motion for Preliminary Injunction. (Doc. No. 17).

## I.      Background

This dispute centers on whether the Individual Defendants breached their respective employment agreements (which included non-compete, non-solicitation, and non-disclosure provisions) with Sunrgy when they began working at SolarTEK.[1]

---

[1] Since the majority of the facts are not in dispute, the Court refers to the pleadings or Motion where applicable for background and context.

Plaintiff is a wholesale distributor of solar energy and electrical products for commercial and residential use. (Doc. No. 17-1 at 2). SolarTEK is a direct competitor of Sunrgy. (*Id.* at 7). During the time relevant to this action, Sunrgy employed ten individuals at its Dallas Office, including the Individual Defendants prior to their resignation. (*Id.* at 3). To secure, manage, and facilitate its employees' use of its information, Sunrgy utilizes a system called "Zoho." (*Id.* at 5). Zoho seemingly enables Sunrgy to manage the majority of its business needs, including its customer list, billing, accounting, and track and schedule purchases of products from suppliers. (*Id.*; Doc. No. 17-2 at 2–3). Zoho allows Sunrgy employees to run reports that compile and organize its data. (Doc. No. 17-2 at 2–3). Sunrgy avers that employee access to different applications and modules of the system are restricted to only those aspects of the system necessary for an employee to perform his or her job duties. (*Id.* at 3).

Defendant Alfaro served as Sunrgy's Sales Manager. (Doc. No. 17-1 at 5). In that role, Alfaro solicited sales from potential and existing Sunrgy customers in both Texas and Oklahoma. (*Id.*). Defendant Guevara served as Sunrgy's Warehouse Manager, where he was responsible for managing Sunrgy's Dallas warehouse facilities. (*Id.* at 6). Defendant Flores worked as a Quality Control Associate in Sunrgy's Dallas office, where he was responsible ensuring Sunrgy received and delivered the correct products. (*Id.*). All Individual Defendants had differing levels of access to Zoho as part of their employment with Sunrgy. (Doc. No. 17 at 7).

All Individual Defendants, as a condition of employment with Sunrgy, signed a: (1) "confidentiality agreement" (the "Agreement"); and (2) a "company property acknowledgement." (*Id.* at 9, 11). The Agreement included "Non-Disclosure," "Non-Solicitation," and "Non-Compete" provisions (collectively, the "Covenants"). (Doc. No. 17-1 at 5; Doc. No. 17-3 at 49–50). The Agreements signed by each Individual Defendant are identical in all material respects.

2

Sunrgy asserts a breach of contract cause of action against each Individual Defendant based on the following provisions.

The Non-Disclosure provision, which also defines "Confidential Information" for the purposes of the provision, is as follows:

> The term "Confidential Information" means all trade secrets and other confidential and proprietary information (whether or not reduced to writing) relating to the Company or its business and not generally known by the public, including, but not limited to: know-how practiced by the Company and its employees; customer lists; pricing data; policies, procedures, proposals, work in progress, customer files, contracts, research materials, formulas, processes, and other data pertaining to services and products provided by the Company; information concerning suppliers and/or customer referral sources; business and marketing plans; projections; financial information and other information with respect to the conduct by the Company of its business. *Employee acknowledges that his/her relationship with the Company is one of trust and confidence with regard to Confidential Information and agrees that he/she shall exercise utmost diligence to protect same. Employee agrees that he/she shall not at any time, either during or after the voluntary or involuntary termination of employment with the Company, in any manner, directly or indirectly, use or disclose to another any Confidential Information (whether acquired or developed by employee alone or in conjunction with others), except as such use or disclosure may be required and authorized in connection with employee's employment with or consented to in writing by the Company.*

(*Id.* at 49) (emphasis added).

The Non-Compete provision, which also defines "Competitive Business" for the purposes of the Agreement, states, in relevant part, that:

> *Employee agrees that during his/her employment with Company and for the period of 12 months immediately following the voluntary or involuntary termination of his/her employment with the Company shall not, without the written consent of Company, in any manner, directly or indirectly: Engage or participate in, become employed by, serve as a director of, or render advisory or consulting or other services in connection with any Competitive Business. . . .* For purposes of this Section, the term "Competitive Business" shall mean any individual or entity which engages in, or proposes to engage in, any of the following in which Employee has been engaged in the 12 months preceding termination of his employment with Company: sourcing, acquiring, selling or reselling, either wholesale or retail, solar energy products including but not limited to solar panels, inverters, racking systems, batteries for energy storage, EV or other charging systems, software for energy management systems and any other associated equipment utilized to install or operate the aforementioned equipment.

(*Id.* at 49–50) (emphasis added).

Lastly, the Non-Solicitation provision provides that:

> *Employee agrees that during his/her employment with Company and for the period of 12 months immediately following the voluntary or involuntary termination of his/her employment with the Company he/she shall not, without the written consent of Company, in any manner: (a) Solicit, directly or indirectly, actively or inactively, employees or independent contractors of the Company to become employees or independent contractors of another person or business; or (b) Solicit, directly or indirectly, the sale of goods, services or combination of goods and services from the established customers of the Company. . . .* it being the general intent hereof that during *such 12-month period after termination of his/her employment Employee will maintain a "hands off" policy with regard to the Company's employees, independent contractors, and established clients and customers.* Employee recognizes that during the period of his/her employment with the Company, the taking of any action(s) referred to in clauses (a) or (b) above as to the employees, independent contractors, or established clients or customers of the Company during such period would be adverse to the interests of the Company and agrees that he/she shall not take any such action.

(*Id.*) (emphasis added).

The Individual Defendants are alleged to have breached, and to have conspired to breach, their Agreements with Sunrgy and divert business from Sunrgy to SolarTEK. (Doc. No. 17 at 6; Doc. No. 17-1 at 7). Alfaro specifically is alleged to have used her position while at Sunrgy to benefit SolarTEK, including selling Sunrgy products to SolarTEK at such a high discount that the sale would have resulted in a loss to Sunrgy. (Doc. No. 17 at 12; Doc. No. 17-1 at 7). Additionally, Sunrgy contends Alfaro violated the Non-Disclosure provisions of the Agreement. (Doc. No. 17 at 19). As alleged, just days before she began working for SolarTEK, Alfaro exported Sunrgy's "Contacts Module" from Zoho to an unspecified device. (*Id.* at 12; Doc. No. 17-2 at 5–6). The Contacts Module produces an Excel report that contains the name and contact information of each Sunrgy customer, as well as information such as price tier, credit limits, and customer preferences. (Doc. No. 17 at 12; Doc. No. 17-2 at 5–6). Sunrgy also alleges Alfaro exported an Invoice Report

4

that contains information such as each customer's contact information, applicable addresses, purchasing history, and credit lines. (Doc. No. 17 at 12; Doc. No. 17-1 at 8; Doc. No. 17-2 at 4–5). Sunrgy maintains that the information found in the Contacts Module and Invoice Report is Confidential Information under the Agreement and trade secrets under both federal and Texas law. (Doc. No. 17 at 18; Doc. No. 17-1 at 9–10).

The Individual Defendants resigned *en masse* on August 2, 2024. (*Id.* at 11; Doc. No. 43-2 at 7; Doc. No. 43-3 at 13; Doc. No. 43-4 at 19). Each Individual Defendant sent an email within 30 minutes of one another voluntarily resigning from Sunrgy "effective immediately." (Doc. No. 17 at 11; ; Doc. No. 43-2 at 8; Doc. No. 43-3 at 13; Doc. No. 43-4 at 19). Each Individual Defendant left Sunrgy to begin employment with SolarTEK, whose office is located just blocks from Sunrgy's Dallas office. (Doc. No. 17 at 11; Doc. No. 43-2 at 5; Doc. No. 43-3 at 13; Doc. No. 43-4 at 19). Flores and Guevara testified that they were "surprised" to see the other Individual Defendants at SolarTEK the same day they resigned from Sunrgy, though Alfaro testified that she was not surprised at all to see the other Individual Defendants at SolarTEK.[2] (Doc. No. 43-2 at 7–9; Doc. No. 43-3 at 16; Doc. No. 43-4 at 19). Yet, each Individual Defendant, while still employed by Sunrgy, signed a "Non-Disclosure Agreement" with SolarTEK as of July 16, 2024—all signed within 24 hours of each other. (Doc. Nos. 44, 44-1, and 44-2). Plaintiff alleges that each Individual Defendant violated the Agreement's Non-Compete provision when they accepted employment at SolarTEK. Alfaro and Flores continue to work at SolarTEK.

---

[2] Franco Guzman, the District Manager for Sunrgy, testified that when he called Alfaro on August 2, 2024, she told him she was leaving the solar energy business altogether, and "confirmed that neither Guevara nor Flores were following her to her new employer." (Doc. No. 17-4 at 2).

Sunrgy also alleges that, once at SolarTEK, Alfaro solicited Sunrgy's customers, taking sales that would have otherwise been Sunrgy's. (Doc. No. 17 at 23).[3] As alleged, Alfaro solicited sales at least four of Sunrgy's established customers on behalf of SolarTEK within approximately two weeks of her departure. (*Id.* at 23–24; Doc. No. 43-7 at 5). Moreover, Sunrgy provided evidence that Alfaro sent, on behalf of SolarTEK, a mass email to all of the customers identified on the Contacts Module with the subject line "Let's Talk Pricing!" (Doc. No. 17-1 at 31). This email was sent just eleven days after she left Sunrgy. (*Id.*). Sunrgy asserts that any sale Alfaro made to a solicited customer resulted in not only financial loss to Sunrgy, but also interfered with its goodwill. (Doc. No. 17-1 at 11). This interference with its goodwill is Sunrgy's basis for its claim that it is entitled to a preliminary injunction, stating that the damage to its business relationships with those customers constitutes irreparable harm for which there are no adequate remedies at law. (Doc. No. 17 at 16).

Sunrgy also brings claims against SolarTEK for civil conspiracy, tortious interference with contract and prospective business advantage, and violations of the Defend Trade Secrets Act (DTSA) and Texas Trade Secrets Act (TUTSA). *See* (*Id.*). Sunrgy alleges SolarTEK misappropriated Sunrgy's trade secrets by obtaining, using, and refusing to return the information without authorization. (*Id.* at 30). Additionally, Sunrgy claims SolarTEK had knowledge of the Individual Defendants' Agreements with Sunrgy and tortiously induced the Individual Defendants to breach their respective Agreements. (*Id.* at 33).

With the consent of both parties, the Court issued a Temporary Restraining Order (the "TRO") on October 11, 2024. (Doc. No. 33). The TRO was extended to November 12, 2024 on October 18, 2024 so that the parties had an opportunity to be heard before the Court. (Doc. No.

---

[3] As noted, Plaintiff also provided evidence that Alfaro was actively aiding SolarTEK while still on the payroll at Sunrgy.

35). Plaintiff now seeks a preliminary injunction. The Court held a hearing on November 12, 2024, where the Court heard oral argument regarding the preliminary injunction and the parties agreed to extend the TRO until the Court could issue this order. Sunrgy bases its request for a preliminary injunction on all of its claims against the Defendants.

Defendants set forth four main arguments in opposition to a preliminary injunction: (1) the Covenants are overbroad and, thus, unenforceable; (2) Alfaro did not take any information with her from Sunrgy when she went to work for SolarTEK; (3) if Alfaro did take information from Sunrgy, it was not confidential; and (4) if Alfaro did take information from Sunrgy that is confidential, the information is now stale so there is no irreparable harm that justifies a preliminary injunction. *See* (Doc. No. 48). Defendants also emphasize, especially with regard to the taking of confidential information, that this industry is primarily price driven. As such, Defendants argue that the impact of the Individual Defendants was minimal at most, as any price information the Individual Defendants allegedly took from Sunrgy becomes stale quickly.

## II.   Legal Standard

A preliminary injunction is an extraordinary remedy that should only be granted if the movant has clearly carried the burden of persuasion on all four factors. *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 196 (5th Cir. 2003). The movant need not prove its entire case. *Lakedreams v. Taylor*, 832 F.2d 1103, 1109 (5th Cir. 1991). To obtain a preliminary injunction, the movant must show: (1) a substantial likelihood they will prevail on the merits, (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted, (3) their substantial injury outweighs the threatened harm to the party whom they seek to enjoin, and (4) granting the preliminary injunction will not disserve the public interest. *City of El Cenizo, Texas v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018).

7

## III.    Analysis

**A.  Likelihood of Success on the merits**

Plaintiff asserts a breach of contract claim against each Individual Defendant. Sunrgy alleges that all Individual Defendants breached their respective contract with Sunrgy (the Agreement) under the Non-Compete clause by working for SolarTEK within 12 months of leaving Sunrgy. Plaintiff also alleges Alfaro breached the contract by violating the Non-Disclosure and Non-Solicitation provisions of the Agreement. For the reasons set forth below, the Court will analyze the alleged Non-Compete and Non-Solicitation violations together.

To succeed on a breach of contract claim, a plaintiff must prove: (1) a valid contract exists; (2) the plaintiff performed or tendered performance as contractually required; (3) the defendant breached the contract by failing to perform or tender performance as contractually required; and (4) the plaintiff sustained damages due to the breach. *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019). The Defendants do not dispute that Plaintiff will be likely to succeed in proving its breach of contract claim, but rather "[b]ecause Plaintiff's PI Motion seeks to enforce overbroad and unenforceable restrictive covenants, the Court should find that Plaintiff is unlikely to succeed on the merits of its case." (Doc. No. 48 at 13). Nevertheless, as discussed below, if the Court finds that the Covenant is overbroad and unenforceable, the Court must reform the Covenant rather than simply refuse to enforce it as written.

### i.   Breach of Contract – Non-Compete and Non-Solicitation

Under Texas law, a covenant not to compete "is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business

8

interest of the promisee." TEX. BUS. & COM. CODE § 15.50(a). The Court will analyze the Non-Solicitation and Non-Compete provisions in the same manner because "a non-solicitation covenant is also a restraint on trade and competition and must meet the criteria of section 15.50 of the Texas Business and Commerce Code to be enforceable." *Rimkus Consulting Grp., Inc. v. Cammarata*, 255 F.R.D. 417, 438–39 (S.D. Tex. 2008).

The parties do not dispute that the Covenants are ancillary to an otherwise enforceable agreement, and the Court finds that the evidence clearly demonstrates that they are. Moreover, the Court agrees with Plaintiff that the Covenants' 12-month temporal restriction is reasonable. Courts consistently enforce non-compete covenants of two years or less. *See, e.g., NRT Tex. LLC v. Wilbur*, No. 22-cv-02847, 2022 WL 364158 at * 3 (S.D. Tex. Sept. 7, 2022) (enforcing one-year non-compete covenant); *Fantastic Sams Franchise Corp. v. Mosley*, No. 16–cv–2318, 2016 WL 7426403 at *4 (S.D. Tex. Dec. 23, 2016) (enforcing 2-year non-compete covenant). Accordingly, the issue before the Court is whether the Covenants' limitations regarding geography and scope of activity are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of Sunrgy.

As an initial note, Texas courts have, with few exceptions, held that non-compete covenants that contain either an industry-wide exclusion from subsequent employment and/or that prevent contact with clients with whom the employee had no contact are unenforceable. *Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 386–87 (Tex. 1991) (citing multiple cases where the non-solicitation provision was unreasonable under § 15.50 because it applied to customers and territory with which the employer had not had actual contact). The Covenants at issue fall into both categories. The Covenants purport to exclude the Individual Defendants from the solar industry as a whole, and prevent contact with clients with whom the employee had no contact while working

9

at Sunrgy. Moreover, Plaintiff concedes that the language of the Covenants is overbroad. *See* (Doc. No. 17 at 16). Thus, the Covenants, as written, are unenforceable under Texas law.

Anticipating this conclusion, Plaintiff asks the Court to reform the language and enforce the Covenants as reformed. (*Id.*). Under Texas law, if a covenant is found to be unreasonable or imposes a greater restraint than necessary to protect the goodwill or other business interests of the promisee, the court *must* reform the covenant "to the extent necessary to cause the limitations contained in the covenant as to time, geographical area, and scope of activity to be restrained to be reasonable and to impose a restraint that is not greater than necessary to protect the goodwill or other business interest of the promisee and enforce the covenant as reformed . . . ." TEX. BUS. & COM. CODE § 15.51(c); *see also GE Betz Inc. v. Moffitt-Johnson*, 301 F. Supp. 3d 668, 687 (S.D. Tex. 2014), *aff'd in part sub nom., GE Betz, Inc. v. Moffitt-Johnston*, 885 F.3d 318 (5th Cir. 2018) ("Once a restrictive covenant has been held to be unreasonable, courts generally must reform the covenant to make it valid.") (citations omitted).

Plaintiff admits that the Covenants are not limited to a geographical area, as they are required to be by statute. *See* TEX. BUS. & COM. CODE § 15.51; (Doc. No. 17 at 15). "A reasonable geographic scope is generally considered to be the territory in which the employee worked for the employer." *TransPerfect Translations, Inc. v. Leslie*, 594 F.Supp.2d 742, 754 (S.D. Tex. 2009). Thus, the geographic scope must logically differ between the Individual Defendants based on their respective roles at Sunrgy.

The Court will address Alfaro first. Plaintiff urges the Court to reform the Non-Compete Covenant to apply to only the states of Texas and Oklahoma. (Doc. No. 17 at 16). Sunrgy bases that request on the fact that Texas and Oklahoma were Alfaro's assigned sales territory. (*Id.*). Defendants argue that the two-state restriction is still overbroad. Defendants, however, do not

propose an alternative geographical limitation, should the court grant a preliminary injunction, nor do they support their conclusion with any convincing evidence. The Court finds that, as applied to Alfaro, the proposed limitation by Sunrgy is reasonable and does not impose a greater restraint than necessary to protect the goodwill or other business interests of Sunrgy. *See Rimkus*, 255 F.R.D. at 436 (finding that the reformed noncompetition covenant should be limited to the areas where the former employee actually worked). Thus, the Non-Compete Covenant, with respect to Alfaro, is limited in scope to Oklahoma and Texas.

Likewise, the Non-Solicitation provision, as written, is also overbroad as to geographic area. "In the absence of an explicit geographic scope, '[a] number of courts have held that a non-compete covenant that is limited to the employee's clients is a reasonable alternative to a geographical limit.' Accordingly, notwithstanding the text of § 15.50(a), a non-solicitation agreement may be enforceable under Texas law even if it does not expressly contain geographical limits." *GE Betz, Inc. v. Moffitt-Johnston*, 885 F.3d 318, 329 (5th Cir. 2018). Yet, the Non-Solicitation Covenant at issue includes neither a geographic area nor a limit to Alfaro's prior clients. The Covenant is, thus, unenforceable as written. Additionally, a covenant "that extends to clients with whom a salesman had no dealings during his employment is unenforceable." *Rimkus Consulting Grp., Inc.*, 255 F.R.D. at 435 (citing *Wright v. Sport Supply Group, Inc.*, 137 S.W.3d 289, 298 (Tex. App.—Beaumont 2004, no pet.). Therefore, the Court finds that a limitation preventing Alfaro from soliciting customers for SolarTEK, or another competitive business, from whom she solicited business while at Sunrgy satisfies the "geographical area" requirement of §15.50 while still protecting Sunrgy's legitimate business interests. Thus, the Court reforms the Non-Solicitation provision, as applied to Alfaro, to limit the Non-Solicitation Covenant to Alfaro's prior customers at Sunrgy from whom she completed or attempted to complete sales.

11

As for Defendants' Flores and Guevara Non-Compete Covenants (against whom Plaintiff is not seeking to enforce the Non-Solicitation clause), "the territory in which the employee worked for the employer" is more limited than with respect to Alfaro. The geographic scope need not be as far reaching, as these individuals did not work in the same capacity as Alfaro. Instead, Flores and Guevara worked in the Sunrgy warehouse, where they were responsible for ensuring Sunrgy's products were properly received and delivered to and from the warehouse, and, at most, spoke to Sunrgy's customers to facilitate delivery of products. (Doc. No. 1 at 10–11). Flores and Guevara worked only in Dallas County, Texas, the location of the Sunrgy warehouse. Thus, the Court finds that a reasonable geographical restriction limiting Flores and Guevara from competing with Sunrgy in Dallas County alone is sufficient to protect Sunrgy's business interest. *See Evan's World Travel, Inc. v. Adams*, 978 S.W.2d 225, 233 (Tex. App.—Texarkana 1998, no pet.) (finding that, where evidence established the employee worked only in one county, that county alone was the proper geographical restriction to the non-compete provision).

The Court also finds that the Non-Compete provision, as written, is overbroad as to scope of activity. The Covenant does not protect a legitimate business interest of Sunrgy by preventing the Individual Defendants from working in any position for any competitor. Plaintiff claims that it has a legitimate business interest in its goodwill and business relationships with customers. The Court does not disagree with this assertion. Yet, in its motion seeking a preliminary injunction, Plaintiff only addresses the "scope of activity" requirement in a conclusory assertion, stating, "the 'scope of activity' reasonably restrained is taking a position with and soliciting Sunrgy's established customers and suppliers on behalf of a Competitive Business." (Doc. No. 17 at 15). The Court finds that preventing all former employees from working for a competitor in *any* capacity is overbroad and does not protect Sunrgy's customer relationships. Instead, it is more akin

12

to an industry-wide ban. Thus, the Court reforms the scope of activity in the Non-Compete provision to restrict the Individual Defendants from taking similar positions at competing businesses. This means that Alfaro may not work in sales for a competing business, and Flores and Guevara may not work in a competing business's warehouse.

In conclusion, the Court finds that Plaintiff is likely to succeed on the merits of its breach of contract claims regarding the Non-Compete and Non-Solicitation provisions, as reformed.

### ii. Breach of Contract — Non-Disclosure

Plaintiff also brings a breach of contract claim against Alfaro regarding the Non-Disclosure provision of the Agreement. Plaintiff asserts that the Invoice Report and Contacts Module qualify as confidential information under the Agreement and constitute "customer lists," which are protected under Texas law. (Doc. No. 17 at 13). "To satisfy the first element of likelihood of success on the merits, [a plaintiff's] evidence in the preliminary injunction proceeding 'is not required to prove its entitlement to summary judgment.'" *Janey v. Alguire*, 647 F.3d 585, 595–96 (5th Cir. 2011).

Defendants vigorously maintain that the information contained in the Invoice Report and Contacts Module is not confidential. Defendants cite to *DeSantis v. Wackenhut* to suggest that the "customer preferences" found in the reports are not confidential information.[4] Unlike in *Wackenhut*, Plaintiff produced evidence that its pricing tiers and credit lines could not be produced simply from asking outsiders, and that Plaintiff took steps to ensure that some of the information that it claimed was confidential remained confidential. (Doc. No. 17-2 at 14). Additionally, some

---

[4] In *DeSantis v. Wackenhut*, the Supreme Court of Texas held that Wackenhut had not demonstrated the existence of confidential information that the non-competition covenant was needed to protect. 793 S.W.2d 670, 684 (Tex. 1990). In reaching that conclusion, the court reasoned, "Wackenhut failed to show that its customers could not readily be identified by someone outside its employ, that such knowledge carried some competitive advantage, or that its customers' needs could not be ascertained simply by inquiry addressed to those customers themselves. Also, Wackenhut failed to show that its pricing policies and bidding strategies were uniquely developed, or that information about its prices and bids could not, again, be obtained from the customers themselves." *Id.*

courts have held that even if customer information is readily available in the industry, liability will be upheld if the defendant gained the information in usable form while working for the former defendant. *A.M. Castle & Co. v. Byrne*, 123 F. Supp. 3d 909, 920 (S.D. Tex. 2015); *see also Zoecon Indus. v. Am. Stockman Tag Co.*, 713 F.2d 1174, 1179 (5th Cir.1983) (citing *Alliantgroup, L.P. v. Feingold*, 803 F. Supp. 2d 610, 625 (S.D. Tex. 2011) ("Even if information is readily available in the industry, it will be protected if the competitor obtained it working for the former employer.").

Defendants also assert that Sunrgy did not protect the alleged confidential information because Alfaro had access to download the Customer Module and Invoice Report even though someone in her position would not have a reason to do so. Yet, the fact that Sunrgy had a Confidentiality Agreement with Alfaro in place shows that Sunrgy took measures to protect the secrecy of the information at issue. *See A.M. Castle & Co*, 123 F. Supp. 3d at 920.

The parties also disagree as to whether Alfaro actually breached the Non-Disclosure agreement. Plaintiff asserts, and provides evidence, that Alfaro downloaded the Customer Module and Invoice Report before resigning from Sunrgy. (Doc. No. 44-4 at 8). Defendants insist that Alfaro does not have, nor has she used any information of Sunrgy's. Yet, as mentioned above, Defendants agree that Alfaro had access to download the Customer Module and Invoice Report even though someone in her position would not have a reason to do so. Plaintiff has provided evidence that Alfaro accessed the two reports on multiple occasions, including evidence that she downloaded the Contacts Module four times roughly two weeks before she resigned. (Doc. No. 44-4 at 8). Since Sunrgy's evidence in the preliminary injunction proceeding "is not required to prove its entitlement to summary judgment," Sunrgy has met its burden to show that it is likely to succeed on the merits of its claim against Alfaro. *See Janey*, 647 F.3d at 595–96.

### iii. Defend Trade Secrets Act and Texas Uniform Trade Secrets Act

The crux of Plaintiff's DTSA and TUTSA claims against SolarTEK is whether the confidential information alleged to be misappropriated qualifies as a trade secret. A preliminary injunction applicant meets its burden by showing a probability of success in proving that its confidential information is entitled to trade secret protection. *Mabrey v. SandStream, Inc.*, 124 S.W.3d 302, 311 & n. 21 (Tex. App.—Fort Worth 2003, no pet.).

To establish misappropriation of a trade secret under federal law, "a plaintiff must show that it owns a trade secret; its trade secret was misappropriated; and the misappropriated trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." *Winsupply E. Houston v. Blackmon*, No. 21-cv-01387, 2021 WL 5504756 at * 5 (S.D. Tex. Nov. 22, 2021) (citing 18 USC § 1836(B)(1)). The DTSA includes compilations of business and financial information in its definition of 'trade secret.' *See* 18 U.S.C. § 1893(3)). Similarly, a claim under TUTSA requires "the existence of a trade secret; acquisition of the trade secret through breach of a confidential relationship or discovery by improper means; and unauthorized use of that trade secret." *Winsupply E. Houston*, 2021 WL 5504756 at * 6. TUTSA defines a 'trade secret' as "all forms and types of information, including business. . . information and . . . compilations, financial data, or list of actual or potential customers or suppliers." TUTSA, § 134A.002(6) (emphasis added). To determine whether there is a trade secret protected from disclosure or use under TUTSA, a court must examine six relevant criteria:

> (1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken to safeguard the seerecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*In re Bass*, 113 S.W.3d 735, 739–40 (Tex. 2003).

15

Both the DTSA and TUTSA require that: (1) the owner of the trade secret takes 'reasonable measures to keep such information secret;' and (2) 'the information derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure of use of the information.'" DTSA § 1839(3)(A)-(B)); TUTSA, § 134A.002(6).

Plaintiff alleges that both the Invoice Report and Contacts Module constitute trade secrets under the DTSA and TUTSA because both "contain a treasure trove of highly valuable competitive information that derive independent economic value to competitors such as [SolarTEK]." (Doc. No. 17 at 18).[5] Sunrgy argues both that the information is confidential, but even more vehemently claims that, even if some of the information is publicly available, the compilations are trade secrets. On the other hand, Defendants claim that neither the Invoice Report and Contacts Module are trade secrets because the lists contain information that is readily ascertainable by internet search or phone calls. (Doc. No. 48 at 20).

While the lists may *contain* information that is readily ascertainable, that information does not destroy the potential trade secret protection of the remaining information included in the same report. *See Pittsburgh Logistics Sys., Inc. v. Barricks*, No. 4:20-CV-04282, 2022 WL 2353334, at *7 (S.D. Tex. June 30, 2022) (finding that a customer list that at least partially contains confidential information can constitute a trade secret). Plaintiff has met its burden of showing a likelihood of success in proving that its confidential information is entitled to trade secret protection. Plaintiff has produced evidence that both reports are a "compilation of business information" or "list of actual or potential customers," which have both been recognized as trade secrets by federal and

---

[5] Counsel for Alfaro admits that Alfaro took a separate two-page list of "potential customers" with her (which included names, emails, and phone numbers), but also maintains that this document does not contain trade secrets because Alfaro found all of the information through an internet search.

Texas law. (Doc. No. 17-2 at 14). Moreover, as noted above, Sunrgy took reasonable measures to keep such information secret when it required its employees to sign a confidentiality agreement regarding information such as this. The information contained in the reports also derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure of use of the information. Though it is true that anyone can gather company names and email addresses off of the internet, the reports contain a wealth of information that could only be obtained through substantial time and effort by Sunrgy.

Plaintiff also provides evidence that Alfaro disclosed that information to SolarTEK. Again, Sunrgy's expert concluded that the Customer Module was downloaded four times just weeks before Alfaro resigned to work for SolarTEK. (Doc. No. 44-4 at 8). Moreover, Alfaro began making sales to prior Sunrgy customers almost immediately after departing Sunrgy. (Doc. No. 43-7 at 5). This information alone is sufficient for Sunrgy to satisfy its burden that Alfaro misappropriated Sunrgy's trade secrets on behalf of SolarTEK. Thus, Sunrgy is likely to succeed on the merits of its DTSA and TUTSA claims against SolarTEK.

### iv. Tortious Interference

Plaintiff also asserts a claim of tortious interference with contract against SolarTEK. To succeed on a tortious interference cause of action, a plaintiff must prove: (1) the existence of a contract subject to interference; (2) willful and intentional interference; (3) that proximately causes damage; and (4) actual damage or loss. *M-I LLC v. Stelly*, 733 F.Supp.2d 759, 788 (S.D. Tex. 2010). Plaintiff focuses on the fact that SolarTEK allegedly knew of the Individual Defendants' Agreements with Sunrgy. (Doc. No. 17 at 19). During oral arguments, Defendant argued that Plaintiff focused on the incorrect standard of "knowingly" rather than "willful and intentional."

The Court notes that Texas courts have found that direct evidence of willful and intentional interference may be demonstrated by showing that "the interfering party knew of the existence of a contract or prospective contract between the plaintiff and a third party or had knowledge of facts that would lead a reasonable person to conclude that a contract or prospective contract existed." *See, e.g.*, *Jannise v. Enter. Prod. Operating LLC*, No. 14-18-00516-CV, 2019 WL 3432171, at \*5 (Tex. App.—Houston [14th Dist.] July 30, 2019, no pet.)

Defendants claim that Plaintiff's tortious interference claim is preempted by TUTSA. (Doc. No. 48 at 22). Defendants cite *StoneCoat of Texas, LLC v. ProCal Stone Design LLC* and *Am. Mortg. & Equity Consultants, Inc. v. Bowersock* to support its position. (*Id.* at 22–23); *StoneCoat of Texas, LLC v. ProCal Stone Design, LLC*, No. 4:17CV303, 2019 WL 4346538 (E.D. Tex. Sept. 12, 2019); *Am. Mortg. & Equity Consultants, Inc. v. Bowersock*, No. 1:19-CV-432-RP, 2019 WL 2250170 (W.D. Tex. May 24, 2019), *reconsideration denied*, No. 1:19-CV-492-RP, 2019 WL 4087400 (W.D. Tex. June 21, 2019). Nevertheless, both cases are easily distinguishable from the case at bar. In both cases, the court found that TUTSA preempted the plaintiff's tortious interference claim when the tortious interference claim was based on the defendant's improper taking of confidential business information. *See, e.g.*, *Am. Mortg. & Equity Consultants, Inc*, 2019 WL 2250170 at \*5. Here, Sunrgy alleges tortious interference based on the Agreement as a whole, which includes not only confidentiality, but a non-compete and non-solicitation provision. (Doc. No. 17 at 19). Thus, TUTSA does not necessarily preempt Sunrgy's tortious interference claim against SolarTEK.

That being said, SolarTEK also asserts that Plaintiff is not likely to succeed on the merits because it cannot prove SolarTEK knew about the employment agreements. Defendant contends that if SolarTEK had no knowledge of the Agreements, it could not have willfully and intentionally

18

interfered with the contracts. Sunrgy points to testimony by Uros Ceglaj, SolarTEK's CEO and designated corporate representative. (Doc. No. 43-1). In his deposition, Mr. Ceglaj testified that a non-disclosure agreement is reasonable for any company in the solar business. (*Id.* at 5). Nevertheless, this admission does not amount to knowledge of the Agreements. At least at this stage, Plaintiff has not demonstrated a likelihood of success on this claim. It could be that such agreements are standard in the industry. In fact, Plaintiff pointed out that SolarTEK had similar agreements with its employees. While both may be true, this Court finds that this evidence does not rise to the level of likelihood to succeed because Plaintiff has not shown SolarTEK had knowledge of the Agreements such that it could intentionally interfere.

## B. Substantial Threat of Irreparable Injury

Irreparable harm generally exists when there is no adequate remedy at law, such as monetary damages. *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). To establish a substantial threat of irreparable injury or harm, the party moving for the preliminary injunction must clearly show a concrete injury or harm resulting from the opposing party's actions. *Texas First. Nat'l Bank v. Wu*, 347 F.Supp.2d 389, 399 (S.D. Tex. 2004).

Sunrgy has shown a substantial threat of irreparable harm because of the loss of goodwill and customers and from the likely disclosure of confidential information that Alfaro acquired during her tenure at Sunrgy. The irreparable harm need not be an existing injury; a strong threat of injury is sufficient. *See U.S. v. Emerson*, 270 F.3d 203 (5th Cir. 2001). The use of an employer's confidential information and the possible loss of customers is sufficient to establish irreparable harm. *See, e.g., Unisource Worldwide, Inc. v. Valenti*, 196 F.Supp.2d 269, 280 (E.D.N.Y. 2002); *Alliantgroup, L.P. v. Feingold*, No. CIVA H-09-0479, 2009 WL 1357209, at *2 (S.D. Tex. May 11, 2009). The loss of goodwill and customers is currently an unquantifiable risk because it is

19

difficult to know how many former Sunrgy clients Alfaro might be able to solicit on behalf of SolarTEK.

Defendants also suggest that even if Alfaro took confidential information from Sunrgy, that information is now stale and, thus, unusable. As such, Defendants allege, there can be no irreparable harm because SolarTEK could not use the stale information to its advantage. The heart of Defendants' argument involves information regarding price. But, even if the pricing information is now stale, the Contacts Module and Invoice Report contained other confidential information. Thus, Sunrgy still faces substantial threat of irreparable injury.

## C. Whether Plaintiff's Substantial Injury Outweighs the Threatened Harm

Allowing Defendants to use Plaintiff's confidential information would put Plaintiff at a significant and unfair disadvantage. Furthermore, Defendants claim that they do not have any of Sunrgy's confidential information. As such, SolarTEK should not be harmed by an injunction prohibiting its use. While the Court understands that the terms of this injunction will affect the lives of the Individual Defendants, the Court balances that consideration with the freedom to contract. The Individual Defendants signed the Agreement and, therefore, it cannot be said that any harm inflicted upon the Individual Defendants outweighs the injury to Sunrgy. Thus, the Court finds that the threatened harm to Plaintiffs greatly outweighs any potential hardship to the Defendants.

## D. Whether Granting the Preliminary Injunction Would Disserve the Public Interest

Preventing employees from taking an employer's confidential information and giving it to a competitor is in the public interest. The public also has an interest in preventing competitors from using a competitor's confidential information to unfairly compete against them. As such, public interest weighs in favor of issuing a preliminary injunction pending trial.

20

## IV.    Conclusion

Accordingly, it is hereby ORDERED that Plaintiff's Motion for Preliminary Injunction is

hereby **GRANTED** and Defendants are hereby enjoined as follows:

A. Beginning from the date of this Order and until the earlier of August 2, 2025 or a final judgment in this case, Defendant Alfaro shall immediately cease and desist working for SolarTEK, or any competitor of Sunrgy, in any sales capacity within the states of Texas and Oklahoma.

B. Beginning from the date of this Order and until the earlier of August 2, 2025 or a final judgment in this case, Alfaro shall immediately cease and desist from directly or indirectly soliciting or attempting to induce any established customer of Sunrgy, with whom she made or attempted to make sales to while employed by Sunrgy, to purchase products from SolarTEK or any other competing business.

C. Beginning from the date of this Order and until the earlier of August 2, 2025 or a final judgment in this case, Defendant Flores shall immediately cease and desist working for SolarTEK, or any competitor of Sunrgy, in any capacity regarding any of its warehouses within Dallas County, Texas.

D. Beginning from the date of this Order and until the earlier of August 2, 2025 or a final judgment in this case, Defendant Guevara shall immediately cease and desist working for SolarTEK, or any competitor of Sunrgy, in any capacity regarding any of its warehouses within Dallas County, Texas.[6]

E. Beginning from the date of this Order and until the earlier of August 2, 2025 or a final judgment in this case, SolarTEK shall immediately cease and desist allowing the Individual Defendants to work for SolarTEK in the above-outlined capacities, whether by terminating them, granting them a leave of absence, reassigning them, or otherwise.

F. All Defendants shall immediately cease and desist any further use or disclosure of any confidential information belonging to Sunrgy; including but not limited to the Invoice Report and Contacts Report.

G. All Defendants shall immediately refrain from deleting, altering, or destroying any confidential information belonging to Sunrgy, including but not limited to the Invoice Report and the Contacts Report, in their possession, custody or control so that such information can be properly preserved in a forensically safe manner for future use in this case.

H. Each Defendant shall return, through counsel, to Sunrgy all confidential information in his/her/its possession, custody, and control by complying with the following procedures.

---

[6] While the Court has been informed that Guevara no longer works for SolarTEK, this does not moot his inclusion in this order as he could otherwise return to SolarTEK prior to August 2, 2025.

i.    Within seven (7) days of this Order, each Defendant, through counsel, shall create and send to counsel for Sunrgy a detailed list of all files in its possession, custody, and control that contain confidential information belonging to Sunrgy and identify the location of each such file and the electronic device, platform, or cloud-based account on which each such file resides (a "File List").

ii.    Within seven (7) days of Sunrgy's receipt of the File List, Sunrgy shall provide to the Defendants a protocol for the return of each file identified on the File List of each Defendant and for the removal of each said file from the electronic device, platform, or cloud-based account on which each such file resides in a forensically safe manner that will ensure preservation of such information for use in this case (the "Protocol").

iii.    Within seven (7) days of Defendants' receipt of the Protocol, each Defendant, through counsel, shall return to counsel for Sunrgy, or such person so designated by counsel of Sunrgy, each file on the File List in accordance with the Protocol.

iv.    Defendants shall file any objections, if any, to the Protocol with the Court within five (5) days of their receipt of the same and their obligations described above shall be tolled pending the Court's resolution of any such objections. The parties must meet and confer to resolve any such objections prior to seeking court involvement.

v.    The attorneys representing SolarTEK may keep copies of such documents (attorney's eyes only) until the conclusion of this case. At that time, they shall return all copies and data to Plaintiff's counsel and destroy any copies and data kept electronically.

Accordingly, it is so ORDERED that this Preliminary Injunction will remain in effect under entry of a final judgment on the merits of this case, unless otherwise ordered by this Court. It is so ORDERED that pursuant to FRCP Rule 65(c), Plaintiff shall post a bond or other security acceptable to the Clerk's Office—Southern District of Texas—in the amount of $50,000.00. This Preliminary Injunction shall not take effect until a bond is posted.

SIGNED at this 3 day of December, 2024.

Andrew S. Hanen
United States District Judge

22